UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN HANCOCK INSURANCE COMPANY (U.S.A.),<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MINDY GOSS, et al.,<br><br>　　　　Defendants. | Case No. 14-cv-04651-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 30 |

The central issue in the motion for summary judgment of defendant and cross-defendant Windsor Securities Inc. ("Windsor") is whether a financing agreement it executed with the Joe E. Acker Family Insurance Trust (the "Trust"), in which it agreed to pay life insurance premiums in exchange for 10 percent interest on those premiums, entitles Windsor to all of the proceeds of policy as a result the Trust's defaulting on payments due to Windsor. The answer hinges on an interpretation of California Commercial Code section 9620. Because no agreement transferring ownership of the policy and beneficiary rights signed by the Trust after default includes a discharge of liabilities as required by section 9620 to give Windsor the unconditional right to the collateral, or as required by the "Default Sale Right" ("DSR") in the financing agreement, I DENY Windsor's motion. However, I GRANT Windsor's motion for partial summary judgment because the parties do not dispute that Windsor is entitled to recover the amount it loaned to the Trust plus interest and reasonable costs.[1]

---

[1] The legal analysis in this Order is identical to the Order filed contemporaneously in the related case, *Pacific Life Insurance Company v. Gordillo*, Case No. 14-cv-03713.

# BACKGROUND[2]

John Hancock Life Insurance Company issued a life insurance policy on the life of Joe E. Acker. Mot. 1-2 (Dkt No. 30-1). The policy was owned by the Trust. In 2008, the Trust entered into a Premium Financing Agreement ("PFA") with Windsor. *See* Prusky Decl., Ex A (Dkt. No. 30-2) ("PFA"). The PFA consists of 19 documents, which the parties agree are construed as one agreement. *See* Opp. 9-10 (Dkt. No. 37). Under the PFA, the Trust promised to pay Windsor a certain principal amount plus interest by the "maturity date" approximately 27 months after the contract was executed, by July 17, 2010. PFA, Doc. No. 1 at 7. In exchange, Windsor would serve as the borrower on the loan and pay all premiums due on the life insurance policy. The note was secured by "the collateral assignment of the Policy given by Borrower to Lender pursuant to the Assignment of Life Insurance Policy as Collateral." *Id.* at 8. In the event of default, the financing balance was immediately due and payable. *Id.*

The parties executed an assignment of the life insurance policy as collateral. It stated that the Trust assigned a number of rights to Windsor, including "[t]he sole right to collect from Insurer the net proceeds of the Insurance Policy due to the death of the Insured or the maturity of the Insurance Policy," "[t]he sole right to sell the Policy," and power of attorney. *See id.*, Doc. No. 15. The Trust retained ownership of the policy. *Id.* The assignment also included the DSR:

> DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

*Id.*, Doc. No. 15 at 4 (emphasis omitted).

---

[2] Windsor requests that I take judicial notice of several documents, all of which are court records. Dkt. No. 30-4. To the extent that I rely on these documents, the request is GRANTED. It is otherwise DENIED as moot.

Upon default Windsor also had the right to allow the policy to lapse and collect from the Trust the amount owed; to sell the policy and take the proceeds of the sale, with the excess being paid to the Trust; or to continue collecting premiums and then recover its debt and give the excess to the Trust in the absence of an executed DSR. *Id.*, Doc 15.

The Trust defaulted under the terms of the PFA, made no attempt to repay any of the loan to Windsor, and did not object to Windsor continuing to pay premiums after default. *See* Goss Decl. ¶¶ 3, 12-13 (Dkt. No. 38). It subsequently entered into an agreement with Windsor, in which the Trustee, Ronald Mark Goss, signed an "Absolute/Gift Assignment – Life Insurance" form (the "Assignment") that transferred ownership of the Policy to Windsor. *See id.* ¶ 6; *id.* at Ex. B. On the form, Goss checked the box providing an "absolute assignment," which states, "[f]or value received, the undersigned hereby transfers and assigns absolutely all rights and interest in the above policy(ies) to the assignee." Goss Decl., Ex. B.

The same day, Windsor directed Goss to sign an updated form entitled "Change of Ownership (Absolute Assignment)." Goss Decl. ¶ 7. This letter stated that Windsor understood Goss was "taking this action because the premiums required to keep the policy in force are now beyond the amount Windsor is responsible for according to financing documents, and [Goss] would therefore rather assign the policy than pay those monies." Goss Decl., Ex. C. The second "Change of Ownership (Absolute Assignment)" form stated that "the undersigned hereby transfers and assigns absolutely, all rights, title and interest in the above policy(ies) to the Assignee(s) indicated below and HEREBY REVOKES ANY BENEFICIARY DESIGNATION or direction of payment previously made in respect to the proceeds payable on the death of the Life Insured under the above policy(ies) and directs that such proceeds be paid to the Assignee(s) . . . The Assignor(s) WARRANT the validity of this assignment." Goss Decl., Ex. D.[3]

---

[3] Each party provides evidence of its subjective belief of the meaning of the Assignment. The Trust asserts that Goss did not know that he was giving up the right of the Trust to receive excess death benefits, Goss Decl. ¶¶ 3, 14, and that Windsor did not suggest that it was releasing the Trust from its obligations under the PFA in exchange for signing the form. *Id.* ¶ 12. Windsor maintains that it believed the Assignment gave it the absolute right to the entire death benefits. Because my decision rests on an interpretation of the plain language of the contracts and of California law, this evidence is immaterial.

3

1   After default occurred and the Assignment was executed, Windsor continued to make premium payments on the policy. *Id.* ¶ 15. Acker died, and Windsor and the Trust both claimed the death benefits, prompting the insurance company to file this lawsuit and interpleader. *See* Prusky Decl. ¶ 10.

Windsor moved for summary judgment, claiming that the Assignment constituted an exercise of the DSR and that it was entitled to the full amount of death benefits. Mot. 1. The Trust contends that there was no exercise of the DSR and that it should receive the excess of the death benefits, less the amount that Windsor is owed in premiums and interest. Opp. 1-2. I heard argument on August 12, 2015.[4]

## LEGAL STANDARD

A court will grant a motion for summary judgment where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court will consider only material facts and not "factual disputes that are irrelevant or unnecessary." *Id.* In order to prevail, the nonmoving party must demonstrate with reasonable particularity that the evidence precludes summary judgment. *Noriga*, *v. Ahmed*, No. CV 12–0889 WHO (PR), 2013 WL 3461931, at *1 (N.D.Cal. July 9, 2013). Absent such a showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted).

Under California law, interpretation of a contract and the determination of whether it is ambiguous "is a question of law that must be decided by the court." *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979). The court looks to extrinsic evidence in determining whether the contract is ambiguous, but cannot consider such evidence if "the

---

[4] In its reply brief, Windsor challenged the standing of Mindy Goss as trustee of the Trust. After supplemental briefing and submission of additional evidence, it became clear that while Mindy Goss did not have standing as trustee, Ronald Goss always did, and he was substituted in as the trustee-defendant in this case. Dkt. No. 67.

1  language of the contract is not reasonably susceptible of interpretation and is unambiguous." *Id.*
2  In such circumstances, the case may be disposed of by summary judgment. *Id.*
3      In interpreting a contract, the court must look to the mutual intent of the parties, looking at
4  the writing alone if possible. CAL. CIV. CODE § 1639; *see also S. California Stroke Rehab.*
5  *Associates, Inc., v. Nautilus, Inc.*, 782 F. Supp. 2d 1096, 1110 (S.D. Cal. 2011). "The language of
6  a contract is to govern its interpretation, if the language is clear and explicit, and does not involve
7  an absurdity." CAL. CIV. CODE § 1638.

## DISCUSSION

9      There are no material facts in dispute. This case turns on whether the Trust executed a
10 valid DSR that assigned Windsor all rights to the death benefits in the insurance policy. The Trust
11 does not dispute that it executed the Assignment, or that it defaulted under the terms of the PFA.
12 *See* Opp. 1. Instead, the Trust asserts that the post-default Assignment into which it entered was
13 not an exercise of the DSR and did not comply with California law. *Id.* at 9-15. The Trust claims
14 that it entered into the agreement that transferred title to Windsor so that Windsor could either
15 make a sale of the policy or continue paying benefits until it could collect death benefits under the
16 PFA. *Id.* In either case, it contends that Windsor is obligated to pay it any excess proceeds from
17 the insurance policy.

### I. EVIDENTIARY OBJECTIONS

19     Each party submitted declarations from purported experts who discuss the industry practice
20 in drafting life insurance finance agreements, and the Trust submitted evidence from Mark Goss,
21 who gave his opinion of what the Assignment meant. *See* Canoff Decl. (Dkt. No. 30-3); Sinnott
22 Decl. (Dkt. No. 40); Goss Decl. The Trust and Windsor object to each other's evidence, even
23 though they offer analogous declarations from experts. *See* Opp. 3. In addition, the Trust objects
24 to Windsor's improperly filed evidentiary objections submitted in addition to its reply, as it
25 violates Civil Local Rule 7-3. Dkt. No. 47.
26     The bulk of the objections are directed to the expert witnesses and/or the Trustees'
27 understandings of the PFA and Assignment. The parties state that these opinions are
28 impermissible parole evidence, and that the terms of the agreements govern. I OVERRULE the

United States District Court
Northern District of California

evidentiary objections to the extent that the declarations provide context, assist in determining ambiguity, or do not otherwise purport to interpret the agreements.

That said, after considering all of the extrinsic evidence offered, I find that the PFA and the Assignment are unambiguous and not reasonably susceptible to multiple interpretations. Their terms are clear and the parties' proffered explanations either contradict these clear terms or are not relevant. Therefore, any extrinsic evidence that contradicts the clear terms of the contracts is irrelevant and will not be considered. The Trust's objection to the objections is DENIED as moot because I apply the same evidentiary standard to all declarations and need not consider Windsor's evidentiary objections in making my determination.

## II. STATUTORY SCHEME GOVERNING ACCEPTANCE OF COLLATERAL

The California Commercial Code governs the disposition of collateral in secured transactions. A central provision to this case is section 9620, which states that "a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if . . . [t]he debtor consents to the acceptance under subdivision (c)" and if the secured party does not receive an objection. CAL. COM. CODE § 9620(a)(1). Subdivision (c) provides:

> For purposes of this section both of the following rules apply:
> (1) A debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default.
> (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:
> (A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained.
> (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.
> (C) Does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.

CAL. COM. CODE § 9620(c). The rights that section 9620 gives to debtors may not be waived. CAL. COM. CODE § 9602 ("to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections . . . (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral in satisfaction of obligation.").

6

### III. THE ASSIGNMENT DID NOT CONSTITUTE AN EXECUTION OF THE DSR

At issue is whether the Assignment satisfies the provisions of California Commercial Code section 9620(c)(2).[5] This statute contemplates two ways in which a debtor may consent to relinquish its claim to collateral. Windsor argues that it has satisfied the first form of satisfaction and that the Trust "agree[d] to the terms of the acceptance in a record authenticated after default." CAL. COM. CODE § 9620(c)(2).

It is undisputed that the Assignment itself does not contain any language that the transfer of ownership satisfied the Trust's liabilities under the PFA. Windsor's primary argument is that together, the PFA and the Assignment satisfy section 9620 as a legal matter. Reply at 4, 6 (Dkt. No. 45) ("the Default Sale Right in the Premium Financing Agreement executed by the Trust itself contains the release required by section 9620(b)"). Windsor contends that section 9620 requires only a default and a transfer of ownership that is effectuated by an authenticated writing. It maintains that under the PFA and California law, the authenticated writing does not need to be a subsequent agreement. It states that the Assignment was an "authenticated record" that satisfied section 9620 because the Assignment transferred ownership and because the parties had previously agreed to the DSR.

Windsor's argument is unpersuasive for several reasons, starting with its understanding of the statute. Section 9620 requires an *agreement* "to the terms of the acceptance in a record authenticated after default." An agreement is not simply a transfer. Section 9602 requires that the agreement include the terms of the acceptance "of collateral in full satisfaction of the obligation it secures." Because the Assignment does not reflect any agreement to transfer the collateral in exchange for a satisfaction of the Trust's obligations, the Trust cannot be considered to have consented under the terms of section 9620. Windsor has not provided any case or other support for its argument that section 9620 requires only a default and an authenticated writing that

---

[5] Neither party asserts that the Assignment was "an acceptance of collateral in partial satisfaction of the obligation it secures." CAL. COM. CODE § 9620(c)(1). Partial satisfaction would not render the Assignment an execution of the DSR. Moreover, the Assignment fails to satisfy section 9620(c)(1) for the same reasons that it does not satisfy (c)(2) – the Assignment did not discharge the Trust of its obligation to Windsor under the PFA and thus did not include all "terms of the acceptance."

7

transfers ownership.

In addition, section 9620 provides that a debtor's consent to acceptance of collateral must be made in an agreement *after default*. The statute repeatedly uses the language of a "record authenticated after default." This is made clear because an agreement to any terms before default would constitute an improper waiver of the rights in section 9620(b). Thus, any construction of the DSR as requiring the Trust to transfer the policy to Windsor in full satisfaction of its obligations pre-default would violate section 9602.[6] By its plain terms, the Assignment does not satisfy section 9620.

Windsor is also incorrect in asserting that the Assignment was simply an execution of the DSR. The DSR allows Windsor to request, "*in consideration of the full and complete satisfaction of the Liabilities* . . . [that the Trust] make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder." PFA, Doc. No. 15 at 4 (emphasis added). Again, although the Assignment makes a full assignment of the policy to Windsor, it does not provide that the transfer of title or change in beneficiary was in "consideration of the full and complete satisfaction of the Liabilities." Just as the lack of such language fails to satisfy the requirements of section 9620, it also fails to satisfy the requirements of the DSR as defined in the PSA. Without such language or any reference to the DSR, it is not clear that the document the Trust signed was the DSR. It would contravene the laws of contract interpretation, and common sense, to read the terms of the DSR into the Assignment when neither the DSR nor its terms were mentioned or in any way incorporated in the Assignment.

Windsor argues that because the Assignment did not need to be executed in order for it to foreclose on the policy, the Assignment's only purpose was to serve as an execution of the DSR. *See* Reply at 1. The Trust counters that the PFA did require the Assignment to be executed separate and apart from any exercise of the DSR. Opp. 5. But even assuming the PFA did not

---

[6] Windsor points to California Commercial Code section 1302, which states that its provisions may be varied by agreement. Mot. 11-12. However, this is limited by the specific provision prohibiting waiver. CAL. COM. CODE § 9602.

8

1    require the Assignment in order for Windsor to foreclose after default, Windsor would not be

2    relieved of its obligation to comply with California law.  That Windsor did not need to execute the

3    Assignment does not change the fundamental fact that the Assignment does not discharge the

4    obligations of the Trust under the PFA.[7]  Windsor's argument contravenes the statute's purpose of

5    protecting both creditors and debtors from strict foreclosures without a clear understanding of the

6    legal consequences.

7          At the hearing, Windsor indicated that there are additional facts that confirm the parties

8    intended the Assignment to serve as an exchange of ownership for satisfaction of liabilities.  I

9    accepted this late argument as an offer of proof, but it does not change my decision.  As discussed

10   above, the language of the Assignment is unambiguous.  It is not proper or necessary to consider

11   any extrinsic evidence that shows a contradictory intent.  *See Pierce Cnty. Hotel Employees &*

12   *Rest. Employees Health Trust v. Elks Lodge*, B.P.O.E. No. 1450, 827 F.2d 1324, 1327 (9th Cir.

13   1987); *Hartnell Cmty. Coll. Dist. v. Superior Court*, 124 Cal. App. 4th 1443, 1451 (2004).

14   Similarly, Windsor's argument that there was a separate offer and acceptance that satisfies section

15   9620, raised at the first time at the motion hearing, fails because section 9620 requires a writing

16   that contains the terms of acceptance.

17         For these reasons, the Assignment does not constitute an exercise of the DSR, and the

18   purported acceptance of the insurance proceeds in full satisfaction of the Trust's debt does not

19   comply with section 9620.  Windsor's motion for summary judgment is DENIED.

20   **IV. WINDSOR IS ENTITLED TO PARTIAL SUMMARY JUDGMENT**

21         In the alternative, Windsor  requested partial summary judgment for "a sum from the

22   [death benefits] equal to the amounts Windsor has loaned to the Insurance Trust, plus legal interest

23   thereon" and the "reasonable costs of collection."  Mot. 13.  The Trust admits that this sum is

24   owed.  It objects to the motion for partial summary judgment on procedural grounds, stating that

---

[7] The Trust's argument that the Assignment was legally required is unpersuasive. *See* Opp. 23 (the Trust was "contractually obligated to execute" the Assignment so that Windsor could take title to the policy, sell it, or collect the death benefit subject to the remaining obligations under the PFA). It appears from the clear language of the PFA that Windsor was able to foreclose absent the Assignment.  *See* Reply at 3.  As discussed, however, whether the Assignment was required does not change the ultimate fact that the Assignment did not comply with section 9620.

1  Windsor made no claim for relief in this action, that the Trust already admitted that Windsor is
2  owed these sums, and that summary judgment is improper because the issue is not contested.
3  Opp. 2-3.  In addition, the Trust expressed concern that Windsor will seek to collect attorneys'
4  fees as the "prevailing party" if I grant the motion for partial summary judgment.  *Id.*

As a preliminary matter, contrary to the Trust's assertion, I have authority to grant partial summary judgment on part of a claim under Rule 56.  *See Semtech Corp. v. Royal Ins. Co. of Am.*, No. CV 03-2460 GAF PJWX, 2005 WL 6192907, at *4 (C.D. Cal. Oct. 11, 2005) ("where summary judgment is not proper on the entire claim, under Rule 56(d) the Court may grant partial summary judgment on discrete elements of the claim").  Windsor's claim for a portion of the death benefits is part of its second cross-claim for declaratory relief.  *See* Dkt. No. 18 at 11-12 ("Windsor is entitled to declaratory relief with respect to the Death Benefit Proceeds on the grounds that as between Windsor and the Trust, Windsor has the superior right, title, and interest in and to the Death Benefit Proceeds and that therefore the Death Benefit Proceeds ought to be preserved for and paid over to Windsor").

The Trust is bound by its admission that "Windsor is a secured lender and is entitled to retain from the Death Benefit only a sum equal to the amounts Windsor has loaned to the Trust, plus legal interest thereon, plus Windsor's reasonable expenses, if any exist, incurred in collecting or enforcing the Policy collateral, and that the Trust is entitled to the portion of the Death Benefit remaining after that sum has been paid."  Dkt. No. 9 at 8.  Accordingly, Windsor is undisputedly entitled to the principal that it paid on the policy, as well as 10 percent interest and reasonable costs of collection.  *See id.* at 4.

The Trust's fear that partial summary judgment in Windsor's favor will cause Windsor to seek attorneys' fees is not a reasonable basis to deny an otherwise proper partial summary judgment.  Whether Windsor is a "prevailing party" and what are "reasonable expenses" for Windsor to make are questions that may be decided by future motions.  For the reasons set forth above, I GRANT Windsor's motion for partial summary judgment.

## CONCLUSION

Windsor's motion for summary judgment is DENIED.  Its motion for partial summary

1  judgment is GRANTED as to count two of its cross-claim for declaratory relief.   A telephonic

2  case management conference is set for 2:00 p.m. on Tuesday, September 29, 2015 to discuss how

3  this ruling impacts the remainder of this case.  The parties shall file a joint statement by noon on

4  September 28, 2015 describing any issues that remain to be decided at trial, if any, and if there are,

5  how long the trial will last and whether it will proceed as a jury or court trial.[8]

6  **IT IS SO ORDERED**.

7  Dated: September 21, 2015



WILLIAM H. ORRICK
United States District Judge

---

[8] The Trust's request to file a sur-reply is DENIED as moot.  Dkt. No. 64.

11